UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NUMBER 15-0058-01 |
| VERSUS | * | JUDGE ROBERT G. JAMES |
| VACARRA ROGERS<br>a/k/a "Vacarra Comanche" | * | MAG. JUDGE KAREN L. HAYES |

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a supplemented motion to suppress [doc. #s 51 & 84] filed by defendant, Vacarra Rogers. For reasons stated below, it is recommended that the motion be DENIED.

### Background

On October 8, 2014, agents with the Metro Narcotics Unit ("MNU") began monitoring Ouachita Correctional Center detainee, Vacarra Rogers (a/k/a Vacarra Comanche)'s telephone conversations. In so doing, agents heard Rogers arrange for Kendra Turner to travel to Dallas on October 9, 2014, to retrieve what they believed to be was controlled dangerous substances. Armed with this information, an agent applied for, and obtained, a warrant from a state court judge to place a GPS tracking device on Turner's vehicle.

The tracking device notified the agents as the vehicle left Monroe, Louisiana and traveled to Dallas, Texas, arriving at approximately 2:30 a.m. on October 10, before quickly turning around to return to the Monroe area. At 6:06 a.m, on October 10, 2014, an MNU agent applied for, and obtained, a warrant to search Turner's vehicle for methamphetamine. MNU agents stopped Turner's vehicle as it exited I-20 in Monroe, Louisiana, and brought it to MNU headquarters where it was searched. The search uncovered approximately one pound of

methamphetamine hidden in the tire well of the trunk.

On March 26, 2015, a federal grand jury returned a five-count indictment against Vacarra Rogers and three co-defendants, Kevin Honeycutt, Kendra Turner, and Ruby McMillan. One count was directed against Rogers for conspiring to distribute and to possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii) and 846.

On July 1, 2015, Rogers, via counsel, filed the instant motion to suppress all evidence obtained in violation of his constitutional rights. Rogers supplemented his motion on October 2, 2015. Following a hearing held on October 16, 2015, the matter is now before the court.

## Relevant Testimony and Documentary Evidence

Two witnesses testified at the hearing – Ouachita Parish Sheriff's Deputy Paul Knight, and Rogers' co-defendant, Kendra Turner. In addition, the government introduced all twelve of the exhibits that the court accepted into evidence.

The court summarizes relevant testimony and evidence, as follows,

1. On October 8, 2014, Ouachita Parish Sheriff Deputy Paul Knight received information from Sergeant Mike Goin concerning telephone calls made from the Ouachita Correctional Center ("OCC") which were suggestive of activity involving controlled dangerous substances ("CDS"). Specifically, the OCC inmate telephone system revealed that detainee, Vacarra Rogers, had called Kendra Turner, an associate of his, who, along with Rogers had been arrested on August 2, 2014, pursuant to a controlled buy of methamphetamine, but unlike Rogers, released.

    During the first call, Rogers had Turner conference in his mother so he could solicit her (unsuccessfully) to take a child and accompany Turner on the trip because it would make a better "cover." Thirty minutes later, Rogers again called Turner and had her conference in his "uncle." Rogers told his uncle to "have it on deck," because it would be an immediate turnaround. Rogers then had Turner conference in Kevin Honeycutt to whom he explained that everything was set. Rogers did not identify any specific CDS by name, but sometimes referred to the items to be transported as "tires." Over the years, Deputy Knight has heard

    individuals in the drug trade refer to CDS, among other things, as "tires."[1]

2. Further monitoring of the telephone calls revealed that after Turner left work on October 9, 2014, she intended to drive a 2003 Lexus GS 300 bearing Louisiana license plate number YOE 289 to 870 Valleybrook in Arlington, Texas, and to return on October 10. Records confirmed that as of September 22, 2014, the Lexus was registered to Kendra Turner.

3. Armed with this information, Deputy Knight applied for a search warrant to place a global positioning system ("GPS") tracking device on the 2003 Lexus. In his affidavit, Knight represented that agents had monitored jailhouse calls from Rogers to Turner in which Rogers directed Turner to transport "CDS" from Texas to Monroe. Knight noted that Rogers had instructed Turner on how to avoid law enforcement detection. Further conversations between the subjects indicated that Turner would depart the Monroe area when she left work around 10:00 p.m. Citing his fourteen years of experience as a Ouachita Parish Sheriff's deputy, Knight opined that it was common for individuals involved in CDS distribution in Ouachita Parish to travel to parts of Texas to obtain the CDS.

4. On October 9, 2014, at 4:55 p.m., the Honorable Daniel Ellender, 4th Judicial District Court Judge for the Parish of Ouachita, State of Louisiana, signed a warrant authorizing the "search" of the 2003 Lexus GS 300 by seizing the "routes, direction of travel, information and current vehicle locations for a period not to exceed 30 calendar days." That evening at 7:32 p.m., MNU agents placed a tracking device on the Lexus at Turner's place of employment, thus permitting them to remotely monitor the car's movement.

5. Later that evening, the tracking device revealed that the Lexus entered Interstate 20 apparently in Monroe, Louisiana, and proceeded westbound before exiting at 1:39 a.m. on October 10 in the Dallas area. The car stopped at a location on Valleybrook Drive, and remained there for seven and one-half minutes before departing. After stopping at a convenience store, the car re-entered I-20, eastbound. Deputy Knight remained awake throughout the night monitoring the progress of the vehicle. He notified MNU agents regarding everything that transpired.

6. With this additional data from the tracking device, and after having heard Rogers tell Turner during one of the monitored calls that she should not consent to search the vehicle, Scotty Sadler petitioned Judge Ellender on October 10, 2014, at **6:06 a.m.**, for a warrant

---

[1] Knight began his tenure with the sheriff in July 2000, and has served with the MNU since July 2008. He estimated that he has investigated roughly 300 drug cases.

        to search Turner's vehicle.[2] In his supporting affidavit, Sadler recounted the facts from the previous affidavit used to obtain the tracking device warrant, but included the additional fact that the car had traveled to Dallas and stopped briefly at two locations before returning to Ouachita Parish. Sadler averred that the vehicle had been stopped by MNU agents, and that "methamphetamine" was expected to be found. At **6:06 a.m.**, Judge Ellender issued a warrant to search the vehicle which was purportedly located at "I-20 **westbound** 118 milepost, West Monroe, LA 71291."

7.     MNU agents, however, actually stopped Turner's car when it exited I-20 **eastbound** at Jackson Street, Monroe, Louisiana. According to the report prepared by Deputy Knight (Gov.'t Exh. 5), agents observed the vehicle on I-20 at **6:15 a.m.**, and followed it until it exited on Jackson Street. Thus, if the times set forth in the search warrant and Deputy Knight's report are correct, then the agents obtained the search warrant shortly **before** the vehicle was stopped. Furthermore, Deputy Knight testified that they stopped the car for purposes of executing the search warrant.

8.     MNU agents brought the vehicle and its sole occupant, Kendra Turner, to MNU headquarters where, at 7:05 a.m., a search of the vehicle's trunk uncovered a tupperware bowl wrapped in plastic containing 521 grams of methamphetamine.

9.     In his supplement to his motion to suppress, Rogers submitted a sworn affidavit from Kendra Turner, dated September 1, 2015, wherein she averred that (apparently in August and/or September 2014) Rogers had allowed her 17 year old niece to drive the 2003 Lexus to school, but that law enforcement stopped and impounded the car because the five day in-transit tag had expired. According to the towing company records submitted by Rogers, the 2003 Lexus was impounded from September 15-23, 2014. (Invoice; Def. Suppl. Motion, Exh.).

10.     Turner testified that Rogers bought the 2003 Lexus from Robert Thomas in Shreveport. Rogers, however, apparently never received title to the vehicle. *See* Turner Affidavit. Instead, Thomas issued the bill of sale and title to Turner, in her name. Turner then used these documents to register the 2003 Lexus in her name on September 22, 2014. (Turner Affidavit; Registration Information, Gov.'t Exh. 6). The next day, Turner retrieved the

---

     [2] Knight originally had prepared the affidavit in support of the warrant. However, because the duty judge that morning was Judge Ellender who lives in northern Morehouse Parish, there was not enough time for Knight to travel to his home. Accordingly, the agents decided to apply for a warrant electronically, and because Knight was not so-certified, Scotty Sadler made the application. As a result, some of Knight's background information appears on the warrant application, rather than Sadler's – e.g., the years of service and the agency where he is employed.

     Sadler is employed by the Monroe Police Department, and has worked with Knight for the past three to four years. Sadler is an MNU member, was involved in Rogers' prior arrest, and had knowledge of everything in the case.

car from the towing company. (Invoice). Turner maintains that Rogers had her register the car in her name solely so she could retrieve it from the pound. Turner was not under any illusion that the car was hers. According to the odometer readings from the two towing invoices, the car was driven 1,158 miles between September 23, 2014, and October 9, 2014. Turner stated that she owns and drives a Pontiac G6. Rogers' brother drove the Lexus after Turner secured its release from the pound. Knight testified that neither he, nor his team had reason to believe that Rogers somehow was involved in ownership of the vehicle.

## Law and Analysis

Rogers contends that because of omissions and mistakes in the supporting affidavits, the state court judge inappropriately issued the two warrants for the car, and thus, all evidence seized therefrom must be suppressed.[3]

**a)      Defendant Does Not Enjoy Standing to Contest the Search(es) and Seizure of the 2003 Lexus and the Contraband Seized Therein**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST., AMEND. IV. The protections of the Fourth Amendment extend to the states via the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207, 99 S.Ct. 2248, 2253-2254 (1979) (citation omitted). The courts deter Fourth Amendment violations by excluding evidence obtained as a result of the transgression. *See United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (citation omitted).

A key limitation to the foregoing principle, however, is that Fourth Amendment rights may not be vicariously asserted. *United States v. Powell*, 732 F.3d 361, 374 (5th Cir. 2013), *cert.*

---

[3] A third application and warrant for Turner's cellphone were not introduced into evidence at the hearing. In any event, as with the car, *see* discussion *infra*, Rogers failed to demonstrate a legitimate expectation of privacy in Turner's phone as required to support a Fourth Amendment challenge to its search.

*denied*, ___ U.S. ___, 134 S. Ct. 1326 (2014) (citing *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961 (1969). That is to say, a "defendant seeking to suppress evidence under the Fourth Amendment must demonstrate that his or her individual rights were violated." *Id*. (citing *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421 (1978)). Toward that end, the defendant must show that he or she had a legitimate expectation of privacy in the area searched. *United States v. Ibarra*, 948 F.2d 903, 905 (5th Cir. 1991) (citing *inter alia Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561 (1980)). Defendant bears the burden of establishing standing. *United States v. Hernandez*, 647 F.3d 216, 219 (5th Cir. 2011) (citation omitted).[4] Standing is a question of law. *Ibarra supra* (citation omitted).

In determining whether a defendant has a reasonable expectation of privacy sufficient to contest the validity of a search, the court inquires "(1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and (2) whether that expectation of privacy is one which society would recognize as reasonable." *United States v. Finley*, 477 F.3d 250, 258-59 (5th Cir. 2007) (citations omitted). Relevant factors include,

> whether the defendant has a [property or] possessory interest in the thing seized or the place searched, whether he has a right to exclude others from that place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy[,] and whether he was legitimately on the premises.

*Id*.

In his original motion, Rogers did not set forth any basis to support a subjective

---

[4] Although the Supreme Court has merged the "standing" requirement into the substantive Fourth Amendment analysis itself, the Fifth Circuit continues to discuss the Fourth Amendment's "personal" interest requirement in terms of standing. *United States v. Maldonado*, 999 F.2d 1580, 1993 WL 307857, *3, n2 (5th Cir. 1993) (unpubl.).

expectation of privacy in the 2003 Lexus. In fact, he did not assert any possessory interest in the car *or* the drugs seized from the trunk of the Lexus. In *Rakas*, the Supreme Court confirmed that a car passenger has no legitimate expectation of privacy in the car's glove compartment or trunk where the passenger did not assert a possessory interest in the car or in the property seized. *Rakas*, 439 U.S. at 148-149, 99 S. Ct. 421 at 433.[5]

In connection with his supplemental memorandum, however, Rogers adduced an affidavit from Kendra Turner, in which she averred that, at Rogers' direction, she signed papers to have the 2003 Lexus titled and registered in her name – for the limited purpose of retrieving the vehicle from the impound lot during Rogers' detention-induced incapacity. Therefore, in effect, the bill of sale from Thomas to Turner (and the subsequent titling and registration of the car in

---

[5] In an attempt to circumvent the Supreme Court's restrictive application of the exclusionary rule to transgressions of an individual's *own* Fourth Amendment rights, defendant urges the court to consider the Louisiana Constitution which expressly extends standing to "[a]ny person adversely affected" by an illegal search or seizure. LA. CONST. ART. 1, § 5. The various states, of course, enjoy the autonomy to impose higher standards on searches and seizures than that required by the Federal Constitution. *Cooper v. State of Cal.*, 386 U.S. 58, 62, 87 S. Ct. 788, 791(1967). However, the federal courts are not bound to apply these protections in a federal prosecution. Rather, "[w]hether the Fourth Amendment has been violated is determined solely by looking to federal law on the subject." *United States v. Walker*, 960 F.2d 409, 415-16 (5th Cir. 1992); *United States v. Guerrero*, 500 F. App'x 263, 265 (5th Cir. 2012). Similarly, federal law exclusively guides application of the exclusionary rule in federal court. *United States v. Mahoney*, 712 F.2d 956, 959 (5th Cir. 1983). The Supreme Court has categorically rejected the argument that an individual expectation of privacy should be deemed reasonable as a matter of federal constitutional law merely because the underlying seizure was impermissible under state law. *California v. Greenwood*, 486 U.S. 35, 43, 108 S. Ct. 1625, 1630 (1988); *see also United States v. Longoria*, 352 F. App'x 968, 969 (5th Cir. 2009) (evidence that was purportedly seized without a warrant in contravention of local law did not provide grounds for relief under the Fourth Amendment where the defendant did not have a reasonable expectation of privacy in the area searched). Societal understandings of privacy that underpin Fourth Amendment analysis remain independent of state laws on the subject. *See Greenwood, supra.*

her name) was a simulation.[6]

Louisiana law provides that "[o]wnership is transferred between the parties as soon as there is agreement on the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid." La. Civ. Code Art. 2456. Louisiana case law also does not require that the certificate of title be transferred to perfect the sale of a vehicle. *Biggs v. Prewitt*, 669 So. 2d 441, 443 (La. App. 1st Cir. 1995) (citations omitted). In addition, an agreement to sell a motor vehicle need not be notarized or reduced to writing. *Id*. (citations omitted).

Here, insofar as Turner's testimony may support a finding that Rogers purchased the 2003 Lexus from Thomas, and that he retained ownership of the Lexus, Rogers nonetheless does not enjoy standing to challenge the searches at issue.

Rogers did more than cloak Turner with the appearance of legal ownership for the limited purpose of procuring the car's release from the pound. He also authorized Turner, her niece, and his brother to drive the car for an indefinite period. Turner's niece drove the car for an unspecified period before it was impounded on September 15, 2014. Thereafter, between September 23 when the car was released after its initial impoundment, and October 9 when it again was impounded, the car was driven over 1,100 miles. Subtracting the round trip to

---

[6] Under Louisiana law,
an instrument is a *simulation* when, by mutual agreement, it does not express the true intent of the parties. Regardless of possible effects it might have on third parties, a simulation is absolute when the parties to it intend for the contract to produce no effects between them. A simulated sale does not actually transfer ownership of the property: A sale is a simulation when the parties have no good faith intent to transfer ownership, i.e., when it is nothing more than a sham.

*Matter of Zedda*, 103 F.3d 1195, 1204 (5th Cir. 1997) (citations omitted).

Valleybrook Drive, Dallas, Texas (which, according to Google Maps, is 582 miles), someone other than Rogers drove the car an additional 500-plus miles. Given the significant use of the vehicle by multiple drivers (on average more than 32 miles per day during the 16 day period), and the transfer of all the normal incidents of ownership to another, Rogers did not retain an expectation of privacy in the vehicle's movement or its trunk that society would recognize as reasonable. *See United States v. Bereft*, 909 F.2d 111, 116-17 (5th Cir. 1990) (no reasonable expectation of privacy in vehicle when individual has rendered all incidents of ownership to another and disavows any knowledge of or interest in it); *Maldonado, supra* (no reasonable expectation of privacy where defendant purchased the vehicle but placed title in the name of another individual who was the person driving it and who had accepted consignment of the contraband, and where defendant was not present when the vehicle was stopped and searched).[7]

**b)     The Search Warrants Are Supported by Probable Cause**

Even if Rogers *had* demonstrated a legitimate expectation of privacy in the Lexus and its contents, the court still finds that exclusion is not warranted. The exclusionary rule requires the suppression of evidence that is seized pursuant to a warrant unsupported by probable cause. *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (citation omitted). "[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Gibbs, supra* (citation omitted). Thus, "[e]vidence obtained during the execution of a subsequently invalidated search warrant is *not* excluded *if* the officer executing the warrant

---

[7] In *Boruff*, the Fifth Circuit distinguished its earlier decision in *United States v. Dotson*, 817 F.2d 1127 (5th Cir.), *modified,* 821 F.2d 1034 (5th Cir.1987) on the basis that in *Dotson*, the defendant only loaned the car to a friend for a brief period so the friend could wash the car. *Boruff, supra.*

relied on it in good faith." *Id*. If this good faith exception applies, then the inquiry ends. *Gibbs, supra*. The government bears the burden of demonstrating that the good faith exception applies. *U.S. v. Gant*, 759 F.2d 484, 487 (5th Cir. 1985).

Pursuant to the good faith exception, a reviewing court is obliged to defer to an issuing judge's probable cause determination in signing a warrant unless:

(1) the issuing-judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;

(2) the issuing-judge wholly abandoned his judicial role in such a manner that no reasonably well trained officer should rely on the warrant;

(3) the underlying affidavit is "bare bones" (so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable); or

(4) the warrant is so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

*Gibbs, supra* (citations and internal quotation marks omitted).

If the good faith exception does *not* apply, the court must consider whether the warrant was supported by probable cause. *Gibbs, supra*.

Rogers primarily invokes the first qualifier and argues that the good faith exception does not apply because MNU agents misleadingly represented in their warrant applications that Vacarra Rogers had directed Turner to transport "CDS" from Texas to Monroe. Rogers contends that no illicit substances were named in the telephone calls, and instead, only code words such as "tire" were used. However, defendant makes no showing that MNU agents *deliberately lied* or *recklessly disregarded* the truth. *See United States v. Smith*, 609 Fed. Appx. 180 (5th Cir. 2015).

Even if he had made such a showing,

> [a] misstatement can vitiate an affidavit only where the misrepresentations are the product of deliberate falsehood or of reckless disregard for the truth. The court must then consider whether the remaining portion of the affidavit is sufficient to support a finding of probable cause. After omitting all intentional or reckless falsehoods, the issue is whether the affidavit contains facts from which the magistrate could make an informed and independent judgment as to whether probable cause existed and whether there was a substantial basis for his determination that probable cause did exist.

*Moreno v. Dretke*, 450 F.3d 158, 169-70 (5th Cir. 2006) (internal citations and quotation marks omitted).

Probable cause exists when under the "totality of the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006). Furthermore, a magistrate needs only a substantial basis for concluding that a search would uncover evidence of wrongdoing. *United States v. Allen*, 625 F.3d 830, 840 (5th Cir. 2010) (citation omitted).

The undersigned finds that after redacting the information challenged by defendant, the remainder of the affidavit provides probable cause to support the initial tracking device warrant. *See United States v. Namer*, 680 F.2d 1088, 1093 (5th Cir. 1982). Omitting the "CDS" reference, the affidavit stated that a detainee (i.e. someone already in prison on another pending charge) directed a female to take a trip to Texas to retrieve "something" from an individual there. The detainee further instructed the female on how to avoid law enforcement detection – a statement that confirms the trip's illicit purpose. The female also is supposed to make the trip in her vehicle, after she leaves work on October 9, 2014. Finally, the affiant explained that it was common for subjects involved in distribution of CDS to travel to Texas to acquire their product.

The (second) search warrant for Turner's car also was supported by probable cause. The supporting application included the same background information from the tracking device

11

application, but added that the vehicle had traveled to Dallas, Texas, arrived there on October 10, 2014, at 2:30 a.m., and briefly stopped at two locations before returning to the Monroe area. *See e.g., Maryland v. Dyson*, 527 U.S. 465, 465-66, 119 S. Ct. 2013, 2013 (1999) (probable cause to stop and search car where deputy had received tip that driver had gone to New York to buy drugs); *United States v. Benard*, 680 F.3d 1206, 1210 (10th Cir. 2012) (officers had probable cause to stop and search car based on intercepted phone calls from which they inferred that defendant intended to buy cocaine from a tire store, despite the fact that he sometimes bought actual tires there).

Defendant highlights various irregularities in the warrant application including the fact that rather than being stopped on I-20 *westbound* in West Monroe, the vehicle actually was stopped in Monroe after exiting I-20 *eastbound*. Moreover, the application indicated that the agent believed that "methamphetamine" may be found, which defendant contends is evidence that the officers already had searched the car at the time they applied for the warrant. These errors, however, likely represent holdovers from a prior version of the application form that the agents used in another case. Technical errors, of course, do not invalidate a warrant. *United States v. Almaguer*, 589 F. App'x 285, 286 87 (5th Cir. 2015) (citation omitted). Moreover, because Rogers already was in custody on a charge stemming from the controlled buy of methamphetamine, the officers likely anticipated that the CDS in this instance would be the same as before.[8]

---

[8] Similarly, the second search warrant's application's incorrect recitation of Deputy Knight's background information instead of Sadler's is of no moment. Like Knight, Sadler was well-versed in drug interdiction. Indeed, he had been involved in Rogers' prior drug arrest.

In any event, the agents did not need a warrant to stop and search the car.[9] The "automobile exception" to the search warrant authorizes the police to search a vehicle if they have probable cause to believe that it contains contraband. *United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006) (citing *Maryland v. Dyson*, 527 U.S. 465, 467 (1999)). "[T]he automobile exception does not have a separate exigency requirement: 'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.' " *Dyson*, 527 U.S. at 467 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)). "[I]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 825.

As the facts in the warrant application(s) readily demonstrate, the officers had probable cause to believe that Turner's vehicle contained contraband sufficient for them to stop the car and to remove it to headquarters for a safe, thorough search. *United States v. Powell*, 732 F.3d 361, 373 (5th Cir. 2013) *cert. denied*, ___ U.S. ___ , 134 S. Ct. 1326 (2014) (probable cause to search the vehicle also authorized movement of the car to a safer location to conduct the search) (citation omitted).[10]

---

[9] Albeit, the court finds that the agents obtained the second search warrant shortly before stopping the vehicle.

[10] The court notes that the stopping officer is entitled to rely upon the collective knowledge of all the officers and deputies involved in the investigation of Turner and her vehicle. *United States v. Hernandez*, 477 F.3d 210, 215 n13 (5th Cir. 2007) (citation omitted). "Under the collective knowledge doctrine, it is not necessary for the arresting officer to know all of the facts amounting to probable cause, as long as there is some degree of communication between the arresting officer and an officer who has knowledge of all the necessary facts." *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007) (citation omitted). Knight testified that he kept all MNU agents abreast of developments.

In sum, the court discerns no viable Fourth Amendment-inspired challenge cognizable to defendant as a result of the placement of a tracking device on the 2003 Lexus, the subsequent stop and search of the vehicle, or the ensuing discovery of contraband therein.

## Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that defendant, Vacarra Rogers' motion to suppress [doc. # 51] as supplemented [doc. # 84], be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 30th day of October 2015.

_____
KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE